Nos. 21,796 and 21,840.
(CONSOLIDATED.)

MINNIE ALLEN, *Appellee,* v. THE MISSOURI PACIFIC RAILWAY COMPANY, B. F. BUSH, as Receiver etc.; JACOB M. DICKINSON, as Receiver of THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY; THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY; JAMES W. LUSK et al., as Receivers of THE ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, *Appellants,* et al.

SYLLABUS BY THE COURT.

1. RAILROAD SIDETRACKS—*Written Contract for their Use—No Community of Interest Created—Instructions.* Plantiff's husband, who was an officer and employee of an industrial plant, was killed while attempting to pass between two cars standing on a sidetrack when a string of cars were coupled against them. The sidetrack had been maintained for many years under a contract between the owner of the industrial plant and certain railway companies by which the owner of the industrial plant granted to the railways a free and unincumbered right of way for the track, and agreed that the railway companies should have the right to use the track for their own business or for the business of any other person or shipper. The track was afterwards extended by the railway companies and served a number of other industrial plants, and was used in connection with the state and interstate business of the railway companies. *Held,* that it was error to instruct that under these circumstances the railway companies and the owner or lessee of the industrial plant had a community of interest in the sidetrack and were in the joint occupancy of the ground on which the track was laid.

2. SAME—*No Community of Interest Acquired by Continued Trespassing.* In such a case it is error to instruct that if the deceased and his fellow officers and employees and others having business with the industrial plant "made frequent use of the ground on which said track

lay, in passing to and from said building through the doors in the west side thereof, which were in close proximity to said sidetrack, and that this practice had continued for several years," then the railway companies and the owner or lessee of the industrial plant had a community of interest in the sidetrack and were in the joint occupancy of the ground on which the track was laid, and the railway companies were under an obligation to such officers and employees to exercise ordinary care to avoid injuring them.

3. SAME—*Duty of Railway Employees towards Trespassers.* "One who undertakes to cross a railway switch yard of many railway tracks, where engines and cars are likely to be moving at any time in the regular course of the railway's business, is a trespasser and does so at his peril, and the only duty of the railway company and its employees towards such trespasser is not to willfully injure him." (*Malott v. Railroad Co.,* 99 Kan. 115, syl. ¶ 2, 160 Pac. 978.)

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed January 11, 1919. Reversed.

*William R. Smith, Owen J. Wood, Paul E. Walker, Luther Burns,* all of Topeka, *W. P. Waggoner, W. E. Brown,* both of Atchison, *R. R. Vermillion,* and *W. F. Lilleston,* both of Wichita, for the appellants.

*J. A. Brubacher,* and *James A. Conly,* both of Wichita, for the appellee.

The opinion of the court was delivered by

PORTER, J.: This is an appeal from judgment in plaintiff's favor for damages on account of the death of her husband, H. B. Allen.

Several years ago the four railroad companies jointly acquired the right of way and constructed a system of railroad yards, sidetracks, and switches in the northern part of Wichita, which were operated jointly by them under the name of the Wichita Terminal Association. The accident occurred on defendants' right of way, just west of the building leased by the Wichita Alfalfa Stock Food Company, of which Mr. Allen was secretary. West of this building there were five parallel tracks running north and south, and mutually connected; the first was a sidetrack or service track 6 feet west of the stock food company's building; the next was the terminal lead, which

was an association track, and west of this were three Santa Fe
tracks, one of them being the main-line track. The service
or sidetrack where Allen met his death was about 1,500 feet
long and served various industries located immediately east
thereof; it was used generally in the business of the associated
railroads, and was connected at each end with the terminal
lead and through that with the various terminal tracks, the
main-line track, and used in the state and interstate business
of the defendants.

Thirteenth, Fourteenth, Fifteenth and Sixteenth streets are
public streets running east and west; all of them except Four-
teenth street extend across the five tracks at right angles.
Fourteenth street extends east only to the west line of the
right of way of the Atchison, Topeka & Santa Fe Railway Com-
pany and does not cross any of the five tracks. The south line
of the building of the stock food company is 88 feet north of
what would be the northern boundary of Fourteenth street,
had that street been extended across the railroad tracks. The
north line of the building is about 450 feet south of Fifteenth
street.

On the morning of the accident, there stood on the sidetrack
west of the stock food company's building a box car which had
been loaded the day before with products of that company and
sealed and billed out. Sixteen feet south of the loaded car was
an empty freight car, and directly east of the 16-foot opening
between them was an open door into the building of the stock
food company. Immediately north of the loaded car stood a
string of six cars, the south end of which was about 3 feet
from the north end of the loaded car. The string of standing
cars extended north to within 200 feet of fifteenth street. The
switching crew of the terminal association had been operating
in these yards since early in the morning and were switching
cars upon the sidetrack. They had just moved a string of cars
from north of Fifteenth street south and coupled them on to the
cars standing on the tract, which they moved two or three feet
and which came in contact with the loaded car standing by the
stock food company's building. Immediately thereafter, Mr.
Allen was found unconscious between the sidetrack and the
terminal lead, his open umbrella lying near him. Apparently
he had been caught while attempting to pass through the three-

foot space between the north end of the loaded car and the
south end of the string of cars; the physicians found an abra-
sion on his back which would indicate that he was struck by
one of the cars, and his body was probably thrown to the
ground so that it fell between the sidetrack and the terminal
lead. The accident occurred at about 9 o'clock in the morning,
before Mr. Allen had arrived at the building; but he had been
telephoned for at his residence, and word had been sent that
he was on the way to the office. It was a cold, cloudy, misty
morning; rain was falling and freezing as it fell. The plain-
tiff did not attempt to show how Mr. Allen approached the
place where he met with the accident, whether from the north
or from the south, or from around the string of cars standing
on the terminal lead, the south end of which was about opposite
where the accident happened. It was shown that it was his
custom to take the street car at his home and get off either at
Fourteenth or Fifteenth street. When the weather was good
and the ground not wet or muddy, he would get off the car at
Fourteenth street, go east to where the street ended, cross over
the Santa Fe tracks and go north until he was near one of the
doors in the west part of the building, then cross over the side-
track; in bad weather it was his custom to get off the car at
Fifteenth street, go east across the tracks, then south between
the sidetrack and the terminal lead until he came opposite the
building. The office of the stock food company was in the
east end of the building, and Rock Island avenue runs north and
south past the east end of the building; but the evidence showed
that it had been the custom for a number of years for em-
ployees of the stock food company to cross the track at differ-
ent places and enter and leave the building through one of the
west doorways. The facts and circumstances indicated that
Mr. Allen probably came from the north on this occasion, be-
cause if he had come from Fourteenth street he would not have
passed the 16-foot space between the cars just opposite the
open door of the building.

The special findings are that Allen was familiar with the
customary use of the tracks, and that the tracks had been used
daily by railroad employees for the movement of cars and
engines; that one of the railroad employees was riding on the
south end of the string of cars; that the railroad employees

looked south toward Fourteenth street; that the bell on the engine ceased ringing when the engine was about two blocks away, and when the south end of the string of cars was moving over Fifteenth street; that this was about one minute before the coupling was made on the string of standing cars; that Allen was killed between the two cars which were about three feet apart before they were moved; and that possibly the mist and a string of cars standing on the lead track obstructed his view along the track north to Fifteenth street, if he had looked. They found that none of the employees of the defendants saw or knew of Allen's presence until after his injury. In reply to the question, "If you find for the plaintiff, state upon what negligence of the defendants you base your verdict," they made the following answer:

"Knowing the location of the mill and the custom of the officers and its employees using the west door as means of entrance and exit to and from the mill they should have used more precaution. Those cars were shunted south on industrial track and the negligence was in not having a brakeman stationed at the brake when the cars were shunted instead of on side ladder or on the ground part of the time. The brakeman on the string of cars could not have stopped the cars in the position he was in had he seen Mr. Allen."

The negligence alleged in the petition was in leaving a space of three and a half feet between the car filled with the products of the milling company and the car next to the north, knowing that the officers and employees of the stock food company and others wishing to go in or out of the building might enter or pass through the space; in not causing the brakes on the standing cars to be set and fastened so as to prevent the last car from moving; in causing the cars attached to the engine to move against the stationary cars with such force and violence as to push them against the standing cars, even if the brakes had been fastened; in not having a brakeman or other employee near the open space between the cars to warn persons intending to pass over and across the service track through the open space; and in not giving any signal or warning that the coupling was to be made.

It is the contention of the defendants that at the time Mr. Allen met his death he was a trespasser on the right of way, and that the defendants owed him no duty except not to wantonly injure him. The stock food company did not own the fee

in the premises occupied by it, but leased the property after the service track had been constructed. The petition alleged that the service track was constructed in 1908 and was maintained and operated under a contract, a copy of which was attached to the petition. The contract which was introduced in evidence was executed in 1909, long after 265 feet of the service track had been constructed, and the parties to it were Mr. Mullen, who formerly owned the property, and the Wichita Union Stock Yards and Packing House Tracks Association, from which the defendants acquired their interest. By its terms the association agreed to maintain and operate the sidetrack already constructed to the warehouse, on condition that Mullen would ship 100 carloads of product annually. The association was to be at the expense and cost of the construction, and reserved the right to remove the sidetrack if Mullen failed to make the annual shipments stated. He agreed to furnish at his own cost and expense all necessary right of way for the sidetrack, outside of the right of way then owned by the association, the title to the right of way to be free and unencumbered, and of the width and quantity required by the engineer of the association. Under the contract, Mullen had the right to sell, lease, or convey the right to the use of the track without the consent of the association; and he agreed to indemnify the association from all liabilities and damages for any injuries to his employees or servants caused by the railway companies while operating cars on any of their sidetracks. The contract contained the following provision:

"It is further mutually agreed that said sidetrack is to be used by the said party of the second part for the purpose of loading and shipping freight to and from said warehouse, with this reservation, to wit: That the said association shall have the right to use said track for its own business, or for the business of any other person or shipper, provided that such business can in the judgment of the superintendent or other authorized agent of said association, be done on said sidetrack without serious detriment or inconvenience to the business of said party of the second part."

Mullen afterwards leased the warehouse to the stock food company, and assigned to it all his rights and privileges under the contract; the assignment was consented to in writing by the predecessors in interest of the defendants.

The court instructed the jury that, under the terms of the

contract, if they found certain facts about which there was no dispute, that is, that the sidetrack was located on the south half of the property leased by the stock food company, of which Allen was secretary, and that Allen and his fellow officers and employees, and others having business with the stock food company, "made frequent use of the ground on which said track lay in passing to and from said building through the doors in the west side thereof, which were in close proximity to said sidetrack, and that this practice had continued for several years," then the defendants and the stock food company *"had a community of interest in said sidetrack, and they were in the joint occupancy of the ground on which said track was laid,"* and the defendants were under an obligation to the officers and employees to exercise ordinary care to avoid injuring them; that under such circumstances H. B. Allen was not a trespasser, licensee, or invitee of the defendants at the place where he met his injury; and, under the facts stated, if the defendants failed in the manner and form alleged in the petition to exercise ordinary care to avoid injuring Allen, and in consequence thereof he was injured, it was their duty to return a verdict in favor of plaintiff.

There is no dispute in the fact that the 265 feet of the track referred to in the contract was in existence before the contract was executed, and that since then the track had grown to be 1,500 feet long, serving a number of other industries, and was devoted to state and interstate commerce; that the service or sidetrack was a track used and operated in the business of the association, which had a right to use it for any purpose desired in its business. Under the contract, the right of way, "free and unencumbered," was granted to the association; the track was to belong to the association, and it had the right to use it "for its own business, or for the business of any other person or shipper." We fail to find in the contract anywhere a suggestion or intimation of any limitation on the use of the track by the associated railroads during the time it remained there.

Under the interstate commerce act, section 1, the jurisdiction of the interstate commerce commission over railroads includes "switches and spurs, tracks and terminal facilities . . . train yards, . . . railway trackage, whether owned outright or operated under agreement." (Beale and

Wyman on Railroad Rate Regulation, 2d ed., 830.)   The un-
disputed facts are, that the track in question was used and
operated by the defendants as part of a system of trackage
devoted to state and interstate commerce.   It cannot be doubted
that under the terms of the contract, as well as the manner in
which the track was used since 1909, the defendants were
entitled to the uninterrupted and exclusive possession and
occupancy of the track and all of the right of way necessary
for conducting their business.   (K. C. *Rly. Co. v. Allen,* 22 Kan.
285; *Mo. Pac. Rly. Co. v. Manson,* 31 Kan. 337, 2 Pac. 800;
*Tennis v. Rapid Transit Rly. Co.,* 45 Kan. 503, 25 Pac. 876;
*Railway Co. v. Spaulding,* 69 Kan. 431, 77 Pac. 106.)

In *Dotson v. Railway Co.,* 81 Kan. 816, 106 Pac. 1045, the
railroad company built a spur track on land owned by it, and
thereafter sold the land without reserving the right of way,
but continued to use and operate the track for a great many
years, for its own convenience as well as the benefit of the
public, with the knowledge and acquiescence of the owner.   It
was held that the owner could not maintain an action of eject-
ment to evict the company from the premises.   It was said in
the opinion:

"The testimony all shows that while only a few persons have done
business on the spur all who desire to use it are served on equal terms.
It has been used as an integral part of the system for the accommodation
of the company and the public; it is subject to regulation by the state,
and the company, upon refusal, could be required to serve all persons
desiring service upon the road without discrimination."   (p. 822.)

In the syllabus it was said:

"Whether the use of a spur of a railroad is public is not determined
by its length nor the number of industries it may serve.   If it is a part
of a railroad system which the public may use on equal terms as of
right, and is subject to government regulation, it is a public use,
whether few or many are accommodated by its operation."   (syl. ¶ 3.)

The court was in error in the instruction which charged
that the stock food company and the associated railroads had
a community of interest in the track, and that they were in
the joint occupancy of the ground on which the track was
laid, and that the defendants were under any obligation to the
officers and employees of the stock food company, other than
the obligation to the public generally.   Moreover, there was
error in that part of the instruction which charged that if

Allen v. Railway Co.

Allen and his fellow officers and employees, and others having business with the stock food company, made frequent use of the ground on which the track lay in passing to and from the building through the doors, and this practice had continued for several years, the deceased was not a trespasser, licensee, or invitee, and that the defendants were charged with the duty to exercise ordinary care as to him in moving its engines and cars, so as to avoid injuring him. In the late case of *Malott v. Railroad Co.*, 99 Kan. 115, 160 Pac. 978, it was held:

"No public way is established across a railway switch yard merely because pedestrians for many years had so frequently trespassed thereon that they had worn a beaten path across it." (syl. ¶ 1.)

"One who undertakes to cross a railway switch yard of many railway tracks, where engines and cars are likely to be moving at any time in the regular course of the railway's business, is a trespasser and does so at his peril, and the only duty of the railway company and its employees towards such trespasser is not to willfully injure him." (syl. ¶ 2.)

In that case, a path had been worn across the tracks by the travel of persons who frequently trespassed thereon, and it appeared that when freight cars were standing on the tracks, pedestrians "would zigzag to find the openings," through which they would cross, avoiding if possible the danger of climbing on the cars, but climbing over the couplings, if necessary, or over the cars. In the present case, one of the witnesses testified that he had seen Mr. Allen go through over the couplings between the cars, and that in the majority of instances cars were standing on the track there, and it was blocked. In the opinion in the Malott case, *supra*, it was said:

"The fact that many trespassers, like the plaintiff, had worn a path across the switch yard and had persisted in trespassing for many years, swarming around or over or under the cars when the path was blocked by freight cars, did not have the effect of establishing a lawful footway across the defendants' switch yard." (p. 117.)

It was said, too, that that case "does not differ in principle from the precedents of this court except to make the non-liability of the railway company more than ordinarily clear" (p. 117), citing dozens of Kansas cases.

Mr. Allen had been an officer of the stock food company for a number of years, connected with the mill since the organization of the company, and was familiar with the way the cars were operated, according to the testimony of one of the plain-

tiff's witnesses. Under the findings and the conceded facts, defendants were entitled to judgment.

The judgment is reversed, and the cause is remanded with directions to enter judgment against plaintiff.

JOHNSTON, C. J., MASON, J., and WEST, J., dissent.